IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————————

No. 19-2305


UNITED STATES OF AMERICA,
Plaintiff-Appellant,


-vs-


DANIEL GISSANTANER,
Defendant-Appellee.


———————————


Appeal from the United States District Court
for the Western District of Michigan
Southern Division


———————————


**DEFENDANT-APPELLEE DANIEL GISSANTANER'S
PETITION FOR REHEARING EN BANC**

SHARON A. TUREK
Federal Public Defender

JOANNA C. KLOET
Assistant Federal Public Defender
Office of the Federal Public Defender
50 Louis, N.W., Suite 300
Grand Rapids, Michigan  49503
(616) 742-7420

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT IN SUPPORT OF PETITION FOR REHEARING EN BANC ...... 1

BACKGROUND ........................................................................... 2

ARGUMENT ............................................................................... 4

I.   The panel decision authorizes prosecutors to misuse the statistics of probabilistic genotyping ........................................................4

    A.   The panel decision resuscitates the prosecutor's fallacy ...........4

    B.   The panel decision incorrectly imports single-source concepts to the mixed-source, probabilistic context .................................6

II.  The panel decision's testing analysis is inconsistent with Sixth Circuit and Supreme Court precedent ............................................9

    A.   The Sixth Circuit's testing decisions contradict one another ...10

    B.   Supreme Court precedent shows that inadequate testing may render expert testimony unreliable.............................................11

    C.   The district court correctly determined that inadequate testing of STRmix makes it unreliable in this case ..............................13

CONCLUSION AND RELIEF REQUESTED ....................................... 15

COUNSEL'S CERTIFICATE ...........................................................16

CERTIFICATE OF SERVICE ......................................................... 16

ATTACHMENT—Opinion and Judgment, *U.S. v. Daniel Gissantaner* (6th Cir., March 5, 2021).......................................................................... 17

# TABLE OF AUTHORITIES

**Federal Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
509 U.S. 579 (1993)............................................................. 1, 2, 4, 9, 10, 11, 12, 13

*General Electric Co. v. Joiner*
522 U.S. 136 (1997)...................................................................2, 3, 12, 13

*Johnson v. Manitowoc Boom Trucks, Inc.*
484 F.3d 426 (6th Cir. 2007) ...................................................................11

*Kumho Tire Co., Ltd. v Carmichael*
526 U.S. 137 (1999)...................................................................12

*Lawrence v. Raymond Corp.*
501 F. App'x 515 (6th Cir. 2012) ...........................................................10

*McDaniel v. Brown*
558 U.S. 120 (2010)...................................................................1, 3, 4, 5, 6

*Newell Rubbermaid, Inc. v. Raymond Corp.*
676 F.3d 521 (6th Cir. 2012) ...................................................................11

*Pride v. BIC Corp.*
218 F.3d 566 (6th Cir. 2000) ...................................................................10

*Tamraz v. Lincoln Elec. Co.*
620 F.3d 665 (6th Cir. 2010) ...................................................................11

*United States v. Bonds*
12 F.3d 540 (6th Cir. 1993) ...................................................................10, 12

*United States v. Chischilly*
30 F.3d 1144 (9th Cir. 1994) ...................................................................6

*United States v. Gissantaner*
417 F. Supp. 3d 857 (W.D. Mich. 2019) ...........................................................3, 7, 14

*United States v. Semrau*
693 F.3d 510 (6th Cir. 2012) ....................................................................10

*Wilden v. Laury Transp., LLC*
901 F.3d 644 (6th Cir. 2018) ....................................................................11

**State Cases**

*State v. Bloom*
516 N.W.2d 159 (Minn. 1994) ....................................................................6

*State v. Jones*
345 P.3d 1195 (Utah 2015) .........................................................................6

*State v. Rodriguez*
2020 WL 5740990 (Conn. Sept. 24, 2020)..................................................6

*State v. Phillips*
844 S.E.2d 651, 663 (S.C. 2020) ................................................................6

*State v. Spann*
617 A.2d 247, 258 (N.J. 1993).....................................................................6

*State v. Wright*
253 P.3d 838 n.4 (Mont. 2011) ...................................................................6

**Federal Rules of Evidence**

Federal Rule of Evidence 702....................................................................1, 10, 11

Federal Rule of Evidence 702(d) ...............................................................13

**Federal Rules of Appellate Procedure**

Federal Rule of Appellate Procedure 32(a)(7)(C)......................................16

Federal Rule of Appellate Procedure 35(a)(1) ...........................................2, 10

Federal Rule of Appellate Procedure 35(a)(2) ...........................................1

**Sixth Circuit Rules**

Sixth Circuit Rule 32(a) ..........................................................16

**Other Authorities**

Butler, *Advanced Topics in Forensic DNA Typing: Interpretation* (2014) ..............7

Fenton et al., *On the limitations of probabilistic claims about the probative value of mixed DNA profile evidence* (Sept. 10, 2020) ......................................................4

U.S. Gov't Accountability Office, GAO-19-707SP, Science & Tech Spotlight: Probabilistic Genotyping Software, at 1 (2019) gao.gov/assets/gao-19-707sp.pdf............................................................14

Arnaout et al, SARS-CoV2 Testing: The Limit of Detection Matters https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7302192 ....................................15

Stiffelman, "No Longer the Gold Standard," Berkeley J. Crim. L. 110 (Jan. 2019) ..........................................................................................2, 6

**STATEMENT IN SUPPORT OF PETITION FOR REHEARING EN BANC**

This case presents questions "of exceptional importance," Fed. R. App. P. 35(a)(2), about the reliability of a new frontier in DNA evidence: probabilistic genotyping software. High quality, single-source DNA, like that drawn from a blood or saliva sample, has long been the gold standard of forensic evidence. Probabilistic genotyping software, however, purports to analyze very different evidence: low quality, low-quantity mixtures of DNA from multiple sources. Here, the panel reversed the district court's exclusion of probabilistic genotyping evidence and held it was reliable under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The panel's decision fundamentally misapprehends and mischaracterizes the nature of probabilistic genotyping—the science it purported to assess for reliability. In describing the "likelihood ratio" generated by probabilistic genotyping software, the panel commits the "prosecutor's fallacy" that the Supreme Court cautioned against in *McDaniel v. Brown*, 558 U.S. 120 (2010) (per curiam). The decision further reflects a misunderstanding of how interpreting DNA mixtures differs from interpreting single-source DNA. It incorrectly imports language and concepts properly used with respect to single-source DNA profiles to the mixed-source, probabilistic context, thereby misrepresenting the uncertainty inherent in probabilistic genotyping software. Because this is the first federal appellate opinion assessing probabilistic genotyping software under Rule 702, it undoubtedly will be cited widely. Left uncorrected, these foundational errors will sow confusion in lower courts.

Rehearing en banc is also "necessary to secure or maintain uniformity of the

court's decisions." Fed. R. App. P. 35(a)(1). In *Daubert*, the Supreme Court held that in determining whether some scientific technique is reliable, a "key question to be answered" is whether that technique "can be (and has been) tested." *Daubert*, 509 U.S. at 593. This Court's cases are split over how to interpret this "key" *Daubert* factor: Some, like the panel decision, hold that all that matters is whether a theory can be tested; others hold that a district court may consider the adequacy and accuracy of testing as well. The latter approach better adheres to Supreme Court precedent, particularly *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)—a decision post-dating the Sixth Circuit precedent on which the panel relied. This Court should grant rehearing en banc to establish the uniformity that its caselaw currently lacks.

## BACKGROUND

The traditional framework for DNA analysis involves the comparison of a single-source DNA profile—whether derived from a single-source evidentiary sample, such as saliva, or deduced from a simple DNA mixture with readily discernable components—to a reference sample to see if the two profiles "match" (i.e., possess the same alleles at each location tested).[1] R.41-17, PageID.1165 (PCAST Report). While human error can affect any DNA interpretation, the primary source of uncertainty for such a "match" is the chance it could occur by coincidence. This possibility is captured in the form of a statistic called the "random match probability," which reports the rarity of the "matching" DNA profile in some population based upon

---

[1] Unlike touch DNA, bodily fluids like blood, semen, and saliva contain higher quantities of DNA. *See* Stiffelman, "No Longer the Gold Standard," Berkeley J. Crim. L. 110, 114 (Jan. 2019).

empirically-derived allele frequencies. *Id.*; *see also McDaniel*, 558 U.S. at 128-30 (discussing a random match probability of 1 in 10,000).

While single source samples and simple mixtures predominated casework for the nearly 40 years since DNA profiling was first introduced, newer technologies have led to changes in the types of samples being submitted for testing, with crime labs seeing increasingly complex mixtures comprising more contributors and smaller amounts of DNA. *United States v. Gissantaner*, 417 F. Supp. 3d 857, 864 (W.D. Mich. 2019). Probabilistic genotyping attempts to deal with this increased complexity. Fundamentally, a probabilistic genotyping system combines two interpretive tasks. First, it proposes "list(s) of plausible . . . genotypes," or allele pairs, for each contributor to a mixture. *Id.* at 866-67. Because there are multiple plausible genotypes for each contributor—with longer genotype lists and more uncertainty about a contributor's true genotype for lower level contributors—the paradigm of "matching" is inconsistent with a probabilistic genotyping framework. *See infra*, Part I.B. The probabilistic genotyping system instead calculates a "likelihood ratio" based on comparison of the person of interest's genotype to these plausible genotype lists. *Gissantaner*, 417 F. Supp. 3d at 866.

A likelihood ratio is a probability of obtaining the observed evidence—here, the DNA mixture—given two competing hypotheses. *See id.* at 865. A likelihood ratio does *not* report the probability that a particular individual's DNA profile is present in the mixture; indeed, "a number of statisticians have argued that the likelihood ratio should not be presented to the jury in its own right" because of the risk that jurors will conflate the two concepts. Nat'l Rsch. Council, The Evaluation of

3

Forensic DNA Evidence, at 201-02 (1997). High likelihood ratios associated with a reference DNA profile may nonetheless translate to very low probabilities that that profile is actually present where, for example, the competing hypotheses are not exhaustive. *See, e.g.,* Fenton et al., *On the limitations of probabilistic claims about the probative value of mixed DNA profile evidence* (Sept. 10, 2020), arXiv:2009.08850.

## ARGUMENT

After a year-and-a-half of *Daubert* hearings, including live testimony from seven expert witness, written expert reports, and hundreds of pages of briefing, the district court determined that STRmix was not reliable as it had been used in this case and precluded the government from introducing STRmix evidence against Mr. Gissantaner. In its haste to overturn that decision, the panel committed errors that will enable prosecutors to misuse shaky DNA evidence and ignored binding Sixth Circuit precedent. Rehearing en banc is necessary to correct these mistakes.

### I.     The panel decision authorizes prosecutors to misuse the statistics of probabilistic genotyping.

#### A.     The panel decision resuscitates the prosecutor's fallacy.

The Supreme Court explained the prosecutor's fallacy in *McDaniel v. Brown*:

> "The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample. . . . In other words, if a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy."

528 U.S. at 128. Because the evidence in *McDaniel* came from a single source, the Court's opinion speaks in terms of "random match probability." But its explanation also translates into the language of likelihood ratios: If a prosecutor tells a jury that a high likelihood ratio is equivalent to a high probability that the defendant is the source of the DNA found at the crime scene, she has committed the prosecutor's fallacy.

The panel decision commits precisely this error. The statements below commit the prosecutor's fallacy by suggesting that the likelihood ratio tells us the probability that the defendant's DNA is a source of the DNA found at the scene.

- "The software in the end helps to measure the *probability* that a mixture of DNA *includes* a given individual's DNA." Op. at 4 (emphasis added).

- "The likelihood ratio tells us only that, in the abstract and without considering any other evidence in this case, it would be *unusual* if this DNA *contained* no DNA contributed from Gissantaner." Op. at 5 (emphasis added).

At bottom, the likelihood ratio conveys a very specific piece of information: the likelihood of one hypothesis relative to the likelihood of a second hypothesis. Here, the hypotheses that produced the "49 million" likelihood ratio the panel repeatedly cites were (1) that the mixture contained the DNA of Mr. Gissantaner and two other, unrelated individuals and (2) that the mixture contained the DNA of three unrelated individuals, none of whom was Mr. Gissantaner. STRmix determined that the first hypothesis was more likely than the second. But those hypotheses are not exhaustive, and comparing two different hypotheses—for example, assuming four individuals

instead of three in one or both hypotheses—would produce entirely different likelihood ratios. Critically, "nothing about the [likelihood ratio] tells you how objectively likely either hypothesis in fact is." *Stiffelman*, *supra*, at 118.

Because likelihood ratios are dependent on the particular hypotheses chosen, it is even more important to speak with specificity about likelihood ratios than random-match probabilities. But the panel decision does the opposite: It uses language that, the Supreme Court has explained, would clearly commit the prosecutor's fallacy if used to describe random-match probabilities.

Other appellate courts have warned against the prosecutor's fallacy as well. *See, e.g.*, *United States v. Chischilly*, 30 F.3d 1144, 1157 (9th Cir. 1994); *State v. Rodriguez*, 2020 WL 5740990, at *6 (Conn. Sept. 24, 2020); *State v. Wright*, 253 P.3d 838, 845 n.4 (Mont. 2011); *State v. Bloom*, 516 N.W.2d 159, 163 (Minn. 1994); *State v. Spann*, 617 A.2d 247, 258 (N.J. 1993); *State v. Phillips*, 844 S.E.2d 651, 663 (S.C. 2020); *State v. Jones*, 345 P.3d 1195, 1208 (Utah 2015).

The panel's decision authorizes prosecutors throughout the Sixth Circuit to commit the error that the Supreme Court cautioned against more than 10 years ago. This resuscitation of the prosecutor's fallacy will have dire consequences for defendants. Because the panel's decision is the first of its kind from a federal court of appeals, prosecutors around the country will parrot its mistake.

### B. The panel decision incorrectly imports single-source concepts to the mixed-source, probabilistic context.

The panel's errors also include critical misunderstandings of the complexities

of mixture interpretation and the functioning of probabilistic genotyping systems. At the outset, the panel fails to appreciate one of the most challenging aspects of mixture interpretation: the fact that, contrary to the panel's proclamation, *see* Op. at 3, it is quite common, and indeed expected, for unrelated individuals to have "matching" alleles at multiple loci. *See* Butler, *Advanced Topics in Forensic DNA Typing: Interpretation*, at 169 (2014); *see also Gissantaner*, 417 F. Supp. 3d at 863 (explaining that "different alleles at some of the loci" are to be expected). When multiple contributors to a DNA mixture possess the same allele at a particular locus, the data produced is indistinguishable from that which would be derived from a single person. This makes mixture interpretation particularly fraught because "as the number of contributors increases so does the potential for overlap with alleles between the contributors." Butler, *supra,* at 169; *see also* R.152, PageID.4126, 4131 (Transcript). This concept, known as allele sharing, makes it difficult, if not impossible, to determine how many individuals have contributed to a DNA mixture. *Id.* It also inevitably affects downstream mixture interpretation, as "allele drop-out [i.e., loss of DNA data from low level contributors] and potential allele sharing from multiple contributors lead to greater uncertainty in the specific genotype combinations that can be reliably assumed." Butler, *supra*, at 177.

The panel decision gives the impression that probabilistic genotyping systems overcome these challenges, detangling complex DNA mixtures into discrete DNA profiles that then can be compared against the defendant's DNA profile to determine if they "match." *See, e.g.*, Op. at 5, 6 (characterizing the results as "a profile match

7

of 1 in 49 million"). This is not how probabilistic genotyping works. Software pro-

grams are no more able than a human examiner to pull a discrete DNA profile out

of a complex mixture, particularly for a low-level contributor. Instead, the program

generates lists of potential genotypes (i.e., allele pairs) for each contributor at each

locus tested, and then assigns each allele pair a weight based on the software pro-

gram's assessment of how well it fits into the evidentiary mixture. *See, e.g.*, R.37-

11, PageID.266-270; *see also Gissantaner*, 417 F. Supp. 3d at 864-65. For example,

in this case STRmix generated a list of 15 possible genotypes for Contributor 3 (the

trace contributor) at locus D2S1338:

| Genotype | Weighting |
|----------|-----------|
| 19, 19   | 12.93%    |
| 19, 24   | 10.50%    |
| 19, 22   | 9.65%     |
| 24, 24   | 9.58%     |
| 18, 19   | 9.55%     |
| 18, 24   | 7.66%     |
| 22, 22   | 7.06%     |
| 18, 22   | 7.02%     |
| 18, 18   | 7.01%     |
| 22, 24   | 6.22%     |
| Q, 19    | 3.32%     |
| Q, 24    | 3.14%     |
| Q, 18    | 2.71%     |
| Q, 22    | 2.61%     |
| Q, Q     | 1.02%     |

R.37-11, PageID.267-268. As is apparent, STRmix does *not* propose a discrete pair

of alleles for Contributor 3 to which Mr. Gissantaner's DNA profile can be said to

"match" or not. Even if Mr. Gissantaner's genotype at this location were 19, 19—

the highest weighted (i.e., best fit) of the possibilities generated by STRmix—it would not be appropriate to call this a "match," because that allele pair is merely one possibility out of many. Actually, Mr. Gissantaner's actual genotype at this location—19, 21—*is not even among the list of plausible genotypes.* Instead, Mr. Gissantaner can only be included as a potential contributor by presuming that DNA data dropped out, a possibility designated in the STRmix output as a "Q." However, STRmix assesses ten different genotypes as a better fit for Contributor 3 than any genotype that requires the assumption of missing data—including Mr. Gissantaner's genotype. The panel decision fails to appreciate the degree of uncertainty in the trace contributor's true genotype.[2]

## II.    The panel decision's testing analysis is inconsistent with Sixth Circuit and Supreme Court precedent.

In *Daubert*, the Supreme Court held that in determining whether some scientific technique is reliable, a "key question to be answered" is whether that technique "can be (and has been) tested." 509 U.S. at 593. This Court's cases, however, are split over how to interpret this "key" *Daubert* factor: Some, like the panel decision, hold that all that matters is whether a theory can be tested; others hold that a district court may consider the adequacy and accuracy of testing as well. The Supreme Court's decisions concerning Rule 702 make clear that the latter approach is correct. But the

---

[2] This uncertainty means that STRmix may produce *inclusionary* likelihood ratios for many different DNA profiles. This is why—as the district court recognized—it is so important to scrutinize the potential for false positives (i.e., misleadingly high likelihood ratios) for low-level contributors.

panel eschewed that approach here. Accordingly, "en banc consideration is necessary to secure or maintain uniformity of the court's decisions." Fed. R. App. P. 35(a)(1).

### A. The Sixth Circuit's testing decisions contradict one another.

This Court's decisions regarding *Daubert*'s testing factor are split. One set of decisions holds that this factor is satisfied so long as a theory is testable—whether testing actually was performed, or what the results of any testing were, is irrelevant. The panel decision took this approach: It held that because "STRmix can be tested," Op. at 8, this factor was satisfied. The panel explained: "Disputes about the 'adequacy of the [theory's] testing' or about the 'accuracy of [a theory's] results,' generally speaking, provide grist for adversarial examination, not grounds for exclusion." Op. at 7-8 (citation omitted). For support, it pointed to *United States v. Bonds*, 12 F.3d 540 (6th Cir. 1993), which held this factor satisfied where "[t]he dispute between the Government and the defendants is over *how* the results have been tested, not over *whether* the results can be or have been tested," *id.* at 559.

Conversely, in a separate line of cases this Court has consistently held that inadequate testing provides grounds for excluding expert testimony as unreliable. For example, in *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000), this Court affirmed the exclusion of testimony by product-defect experts who had failed "to test their hypotheses in a timely and reliable manner." Similarly, in *Lawrence v. Raymond Corp.*, 501 F. App'x 515, 519 (6th Cir. 2012), this Court affirmed the exclusion of testimony that was "insufficiently tested." So too in *United States v. Semrau*, 693 F.3d 510, 522 (6th Cir. 2012), where this Court affirmed the exclusion of fMRI

lie-detection testimony based on lab-only testing, where other experts in the field had "highlighted the difference between laboratory and real world testing while stressing the need for more testing." In many other cases, this Court has affirmed the exclusion of expert testimony where the experts have failed to test their theories. *See, e.g.*, *Wilden v. Laury Transp., LLC*, 901 F.3d 644, 649 (6th Cir. 2018) ("it was permissible for the district court to determine that the telescoping design was inadequately tested"); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) ("lack of testing" was a "[r]ed flag"); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) ("he answered with tests he *might* do, not tests he had done"); *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 430 (6th Cir. 2007) ("he had entirely failed to test his theory").

### B.  Supreme Court precedent shows that inadequate testing may render expert testimony unreliable.

This Court's cases holding that inadequate testing may render an otherwise testable theory unreliable better cohere with Supreme Court precedent. To start, *Daubert* itself asks not only whether a technique "can be" tested but also whether it "has been" tested. 509 U.S. at 593. Moreover, the Supreme Court has made clear that Rule 702's gatekeeping inquiry is "a flexible one," *id.* at 594, and that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Given the flexibility of this inquiry, it would

be strange if district courts were *prohibited* from asking whether a purportedly test-able technique has been tested, as well as what that testing shows.

Indeed, the Supreme Court itself has weighed the adequacy and accuracy of testing in assessing whether expert testimony was reliable. In *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), the district court had excluded the plaintiff's experts from testifying that "his exposure to [polychlorinated biphenyls] and their deriva-tives 'promoted' his development of small-cell lung cancer." *Id.* at 139. In reviewing that decision for abuse of discretion, the Court closely analyzed the plaintiff's animal studies, as well as his epidemiological studies*, id.* at 144-46. Ultimately, the Court concluded, "it was within the District Court's discretion to conclude that the studies upon which the experts relied were not sufficient, whether individually or in combi-nation, to support their conclusions that Joiner's exposure to PCB's contributed to his cancer." *Id.* at 146-47. Thus, the Court asked not only whether the plaintiff's theory was testable, but also what the purported testing had actually shown, and whether those results were adequate to support a conclusion that theory was reliable.

This Court's decision in *Bonds*, on which the panel decision relied, predates *Joiner* and *Kumho* and overreads dicta from *Daubert*. In discussing testing, *Daubert* quotes two philosophers of science, Carl Hempel and Karl Popper, both of whom emphasized that to qualify as "science" a theory must be falsifiable. 509 U.S. at 593. But *Daubert* never said that the testing inquiry is limited to falsifiability. Rather, *Daubert* instructed district courts to ask whether a theory "has been" tested, and stated that "[p]roposed testimony must be supported by appropriate validation." *Id.* at 590.

12

Moreover, members of the *Daubert* Court recognized that a philosophical investigation into falsifiability might prove difficult for district courts. In an opinion joined by Justice Stevens, Chief Justice Rehnquist wrote: "I defer to no one in my confidence in federal judges; but I am at a loss to know what is meant when it is said that the scientific status of a theory depends on its 'falsifiability,' and I suspect some of them will be, too." *See id.* at 600 (Rehnquist, C.J., concurring in part and dissenting in part).

*Joiner*'s majority opinion, which Chief Justice Rehnquist wrote, accordingly takes a pragmatic rather than philosophical approach: It asks not just whether testing can be done, but also analyzes the testing that *has* been done. Scrutiny is even more critical where, as here, no standards controlling the technology yet exist. R.152, PageID.4015, 4101. That approach is the one that the district court took here and the one that the majority of this Court's *Daubert* cases have taken. The panel decision was wrong, in reliance on pre-*Joiner* caselaw, to reject it.

### C.    The district court correctly determined that inadequate testing of STRmix makes it unreliable in this case.

The district court correctly asked not just whether STRmix is testable, but whether testing has shown that STRmix is reliable for the type of DNA evidence at issue here. That inquiry is both required by Rule 702(d) and particularly important in a case like this, which concerns an extremely peripheral application of a new technology. The DNA evidence here was "a complex mixture of low-copy number/low-template DNA, approximately 0.7 nanograms, with at least three contributors and

13

possibly four, where the person of interest is a minor contributor of 7% of the DNA analyzed, approximately 49 picograms—approximately 8-9 human cells." *Gissantaner*, 417 F. Supp. 3d at 877. The district court determined that although STRmix might be reliable under better conditions, "the evidence on the record does not establish adequate testing and validation of the STRmix software under the conditions of the DNA evidence in this case." *Id.*

That determination was not an abuse of discretion. As the district court noted, a 2016 Report of the President's Council of Advisors on Science and Technology (PCAST) found that probabilistic genotyping methods "appear to be reliable for three-person mixtures in which the minor contributor constitutes at least 20 percent of the intact DNA in the mixture and in which the DNA amount exceeds the minimum level required for the method." *Id.* at 869-70 (emphasis omitted). Mr. Gissantaner, however, "was determined to be a minor contributor of only 7% of the DNA analyzed"—well below that 20% threshold. *Id.* at 870 n.8. Nor, the district court determined, had the Michigan State Police's internal validation studies shown that STRmix was reliable under the peripheral conditions present here. *See id.* at 876-79; *see also* U.S. Gov't Accountability Office, GAO-19-707SP, Science & Tech Spotlight: Probabilistic Genotyping Software, at 1 (2019), gao.gov/assets/gao-19-707sp.pdf ("key question[]" for probabilistic genotyping software is "when should it be avoided or used with caution?"). What is more, here the program's diagnostic test indicated a problem, R.77, PageID.261-33; the MSP laboratory had an unprecedentedly high contamination rate, R.152, PageID.4125; and several pieces of evidence suggested more than three contributors, R.77, PageID.2715, 2744; R.152,

PageID.4133, 4186-87.

Every scientific technique has limits to its reliability. Just as generally reliable COVID-19 tests are less reliable for people with lower viral loads, generally reliable probabilistic-genotyping software might be unreliable in peripheral circumstances too. *See* Arnaout et al, SARS-CoV2 Testing: The Limit of Detection Matters, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7302192. The district court was not wrong to ask whether testing showed that STRmix was reliable under the circumstances here, and it did not abuse its discretion in answering that question "no."

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth herein, defendant requests rehearing en banc.

Respectfully submitted,

SHARON A. TUREK
Federal Public Defender

/s/ Joanna C. Kloet
JOANNA C. KLOET
Dated:  April 2, 2021                Assistant Federal Public Defender

## COUNSEL'S CERTIFICATE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Sixth Circuit Rule 32(a), the undersigned certifies that this Brief contains 3,900 words.

/s/ Joanna C. Kloet
JOANNA C. KLOET
Assistant Federal Public Defender

## CERTIFICATE OF SERVICE

It hereby is certified that a copy of the foregoing was filed electronically on April 2, 2021, and that a copy was made upon opposing counsel through the Court's CM ECF system.

 /s/ Joanna C. Kloet
JOANNA C. KLOET
Assistant Federal Public Defender

# Attachment

***United States v. Daniel Gissantaner***
**Opinion and Judgment**
**(6th Cir., March 5, 2021)**

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0057p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant,*

    *v.*

DANIEL GISSANTANER,

        *Defendant-Appellee.*

No. 19-2305

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cr-00130-1—Janet T. Neff, District Judge.

Argued: January 29, 2021

Decided and Filed: March 5, 2021

Before: SUTTON, BUSH, and MURPHY, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:** Justin M. Presant, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellant. Joanna C. Kloet, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Justin M. Presant, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellant. Joanna C. Kloet, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellee. Maneka Sinha, UNIVERSITY OF MARYLAND, Baltimore, Maryland, M. Katherine Philpott, VIRGINIA COMMONWEALTH UNIVERSITY, Richmond, Virginia, for Amici Curiae.

---

## OPINION

---

SUTTON, Circuit Judge.  At issue in this case is the reliability of a form of DNA-sorting evidence under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

### I.

Daniel Gissantaner became embroiled in an argument with his neighbors.  One neighbor called 911, telling the dispatcher that Gissantaner, a convicted felon, had a gun.  The police responded to the call and found a pistol inside a chest in Gissantaner's house.  The chest belonged to Gissantaner's roommate.  When the government charged Gissantaner with possessing a firearm as a felon, it used DNA-sorting evidence, called STRmix, to link Gissantaner to the gun.

Gissantaner moved to exclude the evidence as unreliable under Evidence Rule 702.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Gissantaner and the government retained experts, who took competing positions on the issue.  The district court in turn appointed two experts of its own to consider the question.  One of these experts said that STRmix evidence is reliable in general and as applied to this case; the other said it is reliable in general but not as applied to this case.  The court excluded the STRmix evidence as unreliable.  The government filed this interlocutory appeal.  *See* 18 U.S.C. § 3731.

### II.

DNA evidence has transformed criminal investigations, trials, and post-conviction proceedings.  Since the late 1980s, it has become a staple of law-enforcement investigations, whether to track down the guilty or to liberate the innocent.  *See* Robert J. Norris, *Exonerated* 35 (2017).  In contrast to blood types and enzymes, an individual's DNA is unique.  *United States v. Bonds*, 12 F.3d 540, 550 (6th Cir. 1993).  No one else shares it, save an identical twin.  That

makes DNA evidence highly pertinent to the work of forensic scientists tasked with investigating crimes.

Complications arise when a sample of evidence, usually a batch of cells included in fluid emitted by an individual or left on an item by touch, contains the DNA of more than one person. Consider this case. Police officers collected the relevant evidence on a gun found in a chest owned by Gissantaner's roommate. They collected the "touch DNA"—skin cells found on the gun—and submitted it for analysis at Michigan's statewide law-enforcement laboratory. Based on the genetic material in the mixture, an analyst determined that the DNA recovered from the weapon came from three people.

In the early years of working with DNA to solve crimes, forensic scientists used one technique—visual comparison—to handle DNA samples with single and multiple strains. While scientists eventually became adept at handling samples with up to two strains of DNA, they faced difficulties beyond that.

A digression into how forensic scientists use DNA evidence helps to explain why. Some spots on the human genome, named loci, contain segments of DNA code that vary widely from one person to another. Each variation is called an allele, and a person generally has two alleles at each locus. Because the alleles vary, no two people are likely to have matching alleles at any given locus. A greater number of matching alleles at a greater number of loci increases the probability that the person of interest matches the sample. *See* Special Master's Report at 17–24, *United States v. Lewis*, 442 F. Supp. 3d 1122 (D. Minn. 2020) (No. 18-194).

One challenge with using mixtures involving several people is that each person might have contributed zero, one, or two alleles at each locus. (Although people have two alleles at each locus, one or more of the alleles might not have made it into the mixture.) If a mixture contains five different alleles at one locus, that could suggest it involves at least three people, with two contributors donating two alleles and a third contributor donating one. But other possibilities remain. It could be that one contributor gave two alleles and three other contributors gave one allele at the locus, suggesting a four-person mixture.

Even with these variations, visual examinations of the alleles in a mixture still allow examiners to estimate how many DNA sources a touch or fluid sample contains. That is just what forensic scientists did in the first decades after they began using DNA to solve crimes.

Visual examinations come with subjective risks, however. The inspection might over-count or under-count the percentage of each individual's contribution to the sample, to the extent inspectors calculated the percentage at all, or might mistake the number of people who contributed to it. *Cf. id.* at 21, 23–24. Visual inspection runs the risk of cognitive biases, too. Studies suggest that an examiner's knowledge of the case—other evidence about the suspect—affects interpretations, frequently not in the suspect's favor. On top of all that, the calculations used to determine the probability of the mixture's occurring by chance, as opposed to coming from the suspect, have to be simplified because human beings, Alan Turing included, are not computers.

Enter STRmix and other DNA-sorting products. Starting in the late 1990s, forensic scientists innovated products to improve investigations of multi-person DNA samples. The idea is to combine the tools of DNA science, statistics, and computer programming to mitigate the risks from subjective assessments of multi-person DNA samples. The software in the end helps to measure the probability that a mixture of DNA includes a given individual's DNA.

In addition to mitigating the risks of human error, the software processes more potential interpretations of a mixture in less time. If an analyst remains unsure whether a sample contains the DNA of three persons or four, she can use the software to crunch the numbers quickly in both ways. The software also mitigates the effect of cognitive bias, as the software does not know the other facts of the case. *Id.* at 23–27. While the software does not eliminate the ever-present risks of human error, it "clearly represent[s] a major improvement over purely subjective interpretation." R.41-17 at 93.

Forensic labs today use several probabilistic genotyping software programs, including STRmix, LRmix, Lab Retriever, likeLTD, FST, Armed Xpert, TrueAllele, and DNA View Mixture Solution. The product used in this case, STRmix, was created in 2011 by John

Buckleton, a civil servant and forensic scientist who works for the Institute of Environmental Science and Research, a government agency in New Zealand.

Roughly 200 forensic science laboratories exist in the United States. Most are affiliated with a government. Michigan, for example, has the Michigan State Police laboratory, dedicated to providing scientific and technological support to law enforcement throughout the State. Over 45 of these law-enforcement laboratories use STRmix, with more on the way. R.l39 at 5–6 (noting that 68 laboratories are in the process of validating STRmix). About ten other laboratories use similar products. The FBI uses STRmix. A license for unlimited use of STRmix costs about $27,000, with proceeds supporting the work of the New Zealand Institute.

The Biology DNA Unit of the Michigan State Police laboratory has used STRmix for six years. The laboratory received training on the software starting in March 2015, and it began using the software for cases in February 2016, about three and a half months before receiving the sample in this investigation.

In Gissantaner's case, an analyst with the Michigan State Police laboratory took information about the DNA present in the mixture and entered it into STRmix to estimate how much of the DNA came from each person. The resulting DNA profile summary said that one person "contributed" 68% of the DNA in the mixture, a second contributed 25%, and a third contributed 7%. The third contributor supplied 8 or 9 cells (approximately 49 picograms) to the mixture.

STRmix compared the DNA of the suspect—Gissantaner—to this profile with the goal of ascertaining a "likelihood ratio" about his potential contribution to the sample. R.77 at 34. A comparison of Gissantaner's DNA to the profile suggested that he matched the third contributor, generating a likelihood ratio of 49 million to 1. More precisely, if less accessibly, that means the DNA "profile is 49 million times more likely if [Gissantaner] is a donor than if he is not." *Id.* at 48.

The two "ifs" capture a qualification. The likelihood ratio tells us only that, in the abstract and without considering any other evidence in this case, it would be unusual if this DNA contained no DNA contributed from Gissantaner. The ratio does not on its own tell us how

likely it is that Gissantaner illegally possessed a firearm. Determining whether it is likely that Gissantaner, as opposed to someone else, contributed to the mixture requires looking at other facts beyond the scope of DNA evidence. Perhaps other people with similar profiles, say relatives of Gissantaner, were nearby. Perhaps the roommate had locked the chest and lost the key long before Gissantaner moved in and had a chance to touch the gun. Or perhaps the DNA landed on the gun without Gissantaner touching it, say when he and his roommate shook hands or when they each touched the same object before his roommate subsequently touched the gun. Even with these qualifications, the evidence remains significant. By accepted measures in the forensic community, a profile match of 1 in 49 million amounts to "very strong support" that Gissantaner somehow contributed DNA to the mixture. R.41-10 at 3.

These two bottom-line conclusions bring into view the need to use evidence of this sort carefully. Such conclusions—the 49-million-to-1 ratio and "very strong support"—can be highly probative of guilt or innocence. Yet the mechanisms for obtaining them—the software, the science—are beyond the ken of most jurors and judges. If highly consequential evidence emerges from what looks like an indecipherable computer program to most non-scientists, non-statisticians, and non-programmers, it is imperative that qualified individuals explain how the program works and ensure that it produces reliable information about the case. All of this explains why the courts have developed reliability standards for admitting evidence of this type and why a functioning adversarial system remains critical in handling it.

III.

Rule 702 of the Federal Rules of Evidence sets the framework for determining whether to admit scientific and other technical evidence in federal civil and criminal cases. It permits an expert to testify about scientific knowledge if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The same set of questions applies to expert testimony and science-based test results. *Compare Johnson v. Manitowoc Boom Trucks, Inc.*,

484 F.3d 426, 427–29 (6th Cir. 2007), *with United States v. Semrau*, 693 F.3d 510, 516, 520 (6th Cir. 2012).

Four inquiries guide the reliability analysis:  Is the technique testable?  Has it been subjected to peer review?  What is the error rate and are there standards for lowering it?  Is the technique generally accepted in the relevant scientific community?  *Daubert*, 509 U.S. at 593–94.  Multi-factor tests, especially non-exhaustive tests, run the risk of obscuring the core inquiry.  The key handholds of Rule 702 thus bear repeating:  To be admissible, any relevant scientific or technical evidence must be the "product of reliable principles and methods" and must have been "reliably applied" in the case.  That is what matters most.  Otherwise, the central point of *Daubert*, to establish that Evidence Rule 702 "displaced" the common law *Frye* test, would be lost and would lead to the replacement of an old common law test with a new (harder to pronounce) common law test.  *Compare Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), *with Daubert*, 509 U.S. at 585–89.  That is not progress.

Through it all, the district court has a "gatekeeping role" in screening expert testimony to ensure that only reliable testimony and evidence go to the jury.  *Daubert*, 509 U.S. at 597.  We give fresh review to a district court's framing of the legal standard, *United States v. Pugh*, 405 F.3d 390, 397 (6th Cir. 2005), and abuse-of-discretion review to its admissibility decision, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

IV.

Measured by Evidence Rule 702 and a proper framing of the *Daubert* factors, the DNA evidence should be admitted on this record.

*Testability*.  An untestable scientific theory is all theory and no science.  In the absence of proof that a technology "can be . . . tested," *Daubert*, 509 U.S. at 593, there is no way to show whether it works (its "refutability" or "falsifiability," a scientist would say) and no way to give it "scientific status."  *Id.*; *United States v. Bonds*, 12 F.3d 540, 559 (6th Cir. 1993).  The question on the table is whether a method can be "assessed for reliability," not whether it always gets it right.  Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *Bonds*, 12 F.3d at 558–59.  Disputes about the "adequacy of the [theory's] testing" or about the "accuracy of

[a theory's] results," generally speaking, provide grist for adversarial examination, not grounds for exclusion.  *Bonds*, 12 F.3d at 558–59; *see United States v. Mitchell*, 365 F.3d 215, 238 (3d Cir. 2004); *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014); *United States v. Baines*, 573 F.3d 979, 989–90 (10th Cir. 2009).

STRmix can be tested.  Using "lab-created mixtures," in which the actual contributors of the DNA samples are known, scientists have tested STRmix to gauge the reliability of the technology.  R.146-14 at 2.  Suppose that one person, Aaron, contributed to a lab-created mixture, but another, Britney, did not.  Forensic scientists can test STRmix to see whether it suggests that Aaron is a match for the mixture, but Britney is not.  If STRmix suggests that Aaron is not a match for the mixture (by outputting a low likelihood ratio), that would be a false negative.  If STRmix suggests that Britney is a match for the mixture (by outputting a high likelihood ratio), that would be a false positive.  Each possibility shows that STRmix is testable, that lab-created mixtures offer a way to "assess[] [the] reliability" of STRmix.  Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

The record from the evidentiary hearings in this case provides a long proof that STRmix is testable and refutable.  Almost all of the evidence in the hearings went to these points:  How often is it accurate?  How often is it not?  Similar evidence of DNA testability has sufficed before in our circuit.  *Bonds*, 12 F.3d at 558.

(The astute reader might remind us that *Daubert* asks whether the scientific theory at issue "can be (and has been) tested."  509 U.S. at 593.  It is not clear what the parenthetical means.  The rest of the *Daubert* considerations—including the next one, peer review—all turn in one way or another on what actual testing of the theory reveals in terms of reliability.  At all events, the point makes no difference here.  STRmix indeed "(has been) tested" many times before, as the rest of this opinion confirms.)

*Peer review*.  Subjecting a new technology to "peer review and publication" offers another measure of reliability.  *Id.*  The "key" is whether "the theory and procedures have been submitted to the scrutiny of the scientific community."  *Bonds*, 12 F.3d at 559.  Publication in a peer-reviewed journal typically satisfies this consideration.  *See Daubert*, 509 U.S. at 594.

Peer review is not student review. It "conditions publication on a bona fide process" of review by other scientists and experts in the field. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 n.6 (9th Cir. 1995). The scientific community uses different conventions for publication from most journals published in the legal community. No offense to former, current, and future members of law journals everywhere: But it is one thing to convince lawyers in training to publish a piece; it is quite another to convince peers in a professional community to publish a piece. That is why readership and citation are pivotal when it comes to legal scholarship and why publication itself is noteworthy in scientific scholarship—and ultimately why publication in a peer-reviewed journal alone typically satisfies this *Daubert* inquiry. *See Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 84–85 (1st Cir. 1998); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 781 (3d Cir. 1994); *United States v. Brown*, 973 F.3d 667, 704 (7th Cir. 2020); *cf. Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316 (11th Cir. 1999); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015).

For like reasons, this factor does not demand independent authorship—studies done by individuals unaffiliated with the developers of the technology. Independent studies, to be sure, advance the cause of reliability. *Bonds*, 12 F.3d at 560. But they are not indispensable. Peer review contains its own independence, as it involves "anonymously reviewing a given experimenter's methods, data, and conclusions on paper." *Mitchell*, 365 F.3d at 238. If experts "have other scientists review their work" and if the other scientists have the chance to identify any methodological flaws, that usually suffices. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 784 (10th Cir. 1999). When scientific research is accepted for publication by a reputable journal following the "usual rigors of peer review," that represents "a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science." *Daubert*, 43 F.3d at 1318.

STRmix clears this bar. At the time of the *Daubert* hearing in the district court, more than 50 published peer-reviewed articles had addressed STRmix. According to one expert, STRmix is the "most tested and most . . . peer reviewed" probabilistic genotyping software available. R.77 at 82. At least two of the studies were done by individuals unconnected to the

development of the software. This plainly suffices. *Bonds*, 12 F.3d at 559–60; *cf. Gross v. Comm'r*, 272 F.3d 333, 340–41 (6th Cir. 2001).

*Error rate and standards to lower it*. Even ten witnesses to a crime come with risks of error. So too for DNA evidence. This consideration looks to the error rate of the technology and to whether the scientific community has established standards that forensic scientists can use to mitigate the risk of error. *Daubert*, 509 U.S. at 594.

Think about Gissantaner's case to see the point. The government would like to use STRmix to match Gissantaner to the DNA on a gun. That is not a good idea—not the "product of reliable principles and methods" under Rule 702—if STRmix has a high error rate, if it has trouble "avoid[ing]" "false positives," and if there are no standards or guidelines to avoid or lessen these risks. *Bonds*, 12 F.3d at 559 (quotation omitted); *Mitchell*, 365 F.3d at 241.

How often, then, does STRmix falsely suggest a suspect matches a DNA sample? Not often, the evidence suggests. When examining "false inclusions," one peer-reviewed study concluded, based on an analysis of the DNA of 300,000 people who were known not to be in a mixture, that STRmix had accurately excluded the non-contributors 99.1% of the time. Just 1% of the time, in other words, it gave a likelihood ratio suggesting that someone was included in the mixture who was not actually included in it. Most of these false inclusions, moreover, were associated with low likelihood ratios—meaning that, under STRmix's own estimates, the confidence that the person was included was low. A likelihood ratio of 100 to 1 is more likely to produce a false inclusion than a likelihood ratio of 1 million to 1. In this instance, the likelihood ratio was 49 million to 1.

One explanation for the low error rate is the existence of standards to guide the use of STRmix and other probabilistic genotyping software, for the two are "[c]losely related." *Mitchell*, 365 F.3d at 241. The Scientific Working Group on DNA Analysis Methods, a national association of forensic laboratories sponsored by the FBI, has produced guidelines governing the use of this kind of software, guidelines that the Michigan State Police laboratory used in this case.

*General acceptance in the scientific community*.  One might still be skeptical of the reliability of a relatively new technology like STRmix, and rightly so, if the relevant scientific community has not yet accepted its use.  *Daubert*, 509 U.S. at 594.  The question for debate is "general acceptance," not uniform acceptance within the community.  *See Bonds*, 12 F.3d at 562.  Nor must the science be beyond reproach.  *Id.*  What matters is whether the relevant scientific community accepts the software.  *See Daubert*, 509 U.S. at 594; *see also Wilden v. Laury Transp., LLC*, 901 F.3d 644, 654–55 (6th Cir. 2018).  After that, the long-tested cauldron of cross-examination, not exclusion, is the place to go for accuracy.  "[C]onventional [trial] devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702."  *Daubert*, 509 U.S. at 596.  For a technology that is widely used, controversies over its use in a given case usually will be left to the jury.  *See United States v. Jones*, 965 F.3d 149, 160 (2d Cir. 2020).

STRmix satisfies this consideration.  It has garnered wide use in forensic laboratories across the country.  More than 45 laboratories use it, including the FBI and many state law enforcement agencies.  At this point, STRmix is the "market leader in probabilistic genotyping software."  R.146-1 at 17.

Consistent with this reality, numerous courts have admitted STRmix over challenges to its general acceptance in the relevant scientific community.  *See United States v. Lewis*, 442 F. Supp. 3d 1122, 1155 (D. Minn. 2020) ("[T]here is no doubt that STRmix has gained general acceptance."); *United States v. Washington*, No. 8:19CR299, 2020 WL 3265142, at *2 (D. Neb. June 16, 2020) ("Authority and evidence demonstrate that STRmix is generally accepted by the relevant community."); *People v. Blash*, No. ST-2015-CR-0000156, 2018 WL 4062322, at *6 (V.I. Super. Ct. Aug. 24, 2018); *People v. Muhammad*, 931 N.W.2d 20, 30 (Mich. Ct. App. 2018); *People v. Bullard-Daniel*, 42 N.Y.S.3d 714, 724–25 (N.Y. Co. Ct. 2016); *United States v. Christensen*, No. 17-CR-20037-JES-JEH, 2019 WL 651500, at *2 (C.D. Ill. Feb. 15, 2019) ("STRmix has been repeatedly tested and widely accepted by the scientific community."); *United States v. Oldman*, No.18-CR-0020-SWS, ECF No. 227 at *16 & n.5 (D. Wyo. Dec. 31, 2018) (collecting cases); *United States v. Russell*, No. CR-14-2563 MCA, 2018 WL 7286831, at

*7–8 (D.N.M. Jan. 10, 2018) ("[STRmix's] analyses are based on calculations recognized as reliable in the field."); *United States v. Pettway*, No. 12-CR-103S (1), (2), 2016 WL 6134493, at *1 (W.D.N.Y. Oct. 21, 2016) (discussing "exhaustive[] research[]" concluding that "the scientific foundations of the STRmix process are based on principles widely accepted in the scientific and forensic science communities"). The Second Circuit determined that the scientific community accepted a different (but similar) DNA-sorting software, Forensic Statistical Tool, even though just one laboratory had used it. *Jones*, 965 F.3d at 156, 162.

General acceptance of probabilistic genotyping software, moreover, has led to its use in inculpatory and exculpatory settings alike. *See* Erik Ortiz, A Texas jury found him guilty of murder. A computer algorithm proved his innocence., https://news.yahoo.com/prison-murder-computer-algorithm-helped-105609137.html (last visited March 3, 2021); Jason Hanna & Nick Valencia, Thanks to a new DNA analysis, a Georgia man is exonerated of rape and freed from prison after 17 years, https://www.cnn.com/2020/01/10/us/georgia-kerry-robinson-released/index.html (last visited March 3, 2021).

All in all, STRmix satisfies Rule 702 and the case law construing it. In the words of Rule 702, it is the "product of reliable principles and methods."

V.

But were those principles "reliably applied" in this case, as Rule 702 also asks? Yes, as we explain and as the record in this case demonstrates.

The Michigan State Police laboratory complies with the guidelines promulgated by the Scientific Working Group, as confirmed through an audit performed by the FBI. The forensic scientist who ran the sample in this case began training with STRmix more than a year before analyzing the sample. During that time, the laboratory tested its copy of the software, using lab-created mixtures to establish "internal validation" that STRmix reliably assisted the laboratory's work. R.77 at 52. In addition to these artificial mixtures, the laboratory tested adjudicated-case samples, real samples from real crime scenes. It produced a summary explaining the results of its tests and offered additional data to supplement the summary. In

general, the laboratory's use of STRmix produced "significant likelihood ratios" for known contributors and improbable ones for known non-contributors.  R.41-14 at 43.

The Michigan State Police laboratory's internal validation also included samples like the one in this case in which a minor contributor donated a small amount of DNA.  It tested a mixture in which one contributor gave just 4% of the DNA (less than the 7% here) and another mixture in which the minor contributor gave only 26 picograms of DNA (less than the 49 picograms here).  The laboratory also produced supplemental data showing that its internal validation included a lab-created mixture of 3.2% *and* 32 picograms and an adjudicated-case mixture of 4% *and* 10 picograms.  The government offered to provide still more data for those interested, but the district court declined the offer.

STRmix also accounts for small amounts of DNA when it creates profile summaries. Because less DNA in a sample creates more uncertainty, STRmix generates lower likelihood ratios for low-quantity DNA mixtures than it otherwise would.  The software also errs in the direction of the innocence of criminal suspects by making conservative estimates about the probability of a genetic pattern occurring.

The Michigan State Police laboratory has ample company in concluding that STRmix works at low levels of DNA.  A peer-reviewed article compiling data from the internal validations of 31 independent laboratories indicated that STRmix had been validated with mixtures involving a minor contributor who supplied a small percentage of a mixture.  The FBI's internal validation, also subjected to peer review, included mixtures in which the minor contributor contributed less than 7% and fewer than 49 picograms to the sample.  Gissantaner did not introduce any studies showing STRmix is unreliable at low levels.

On this record, the "reliable principles and methods" underpinning STRmix were "reliably applied" in this case.  Fed. R. Evid. 702.  Any lingering concerns about how the Michigan State Police laboratory presented the information from its internal validation study or doubts about the reliability of STRmix at low levels of DNA can be hashed out through cross-examination or testing by the defendant.  On appeal, Gissantaner and his team have not objected to the level of access the owners have provided to the program's source code or to their

ability to run their own tests at different parameters as well as to observe how the laboratory operates STRmix. While they have not used their access to this information yet to undermine the reliability of STRmix in general, they remain free to do so at trial.

## VI.

Gissantaner resists this conclusion on several fronts, each unconvincing.

He claims that the standard of review favors him. That is true. But a district court may abuse its discretion by incorrectly framing the legal standard. *See United States v. Flowers*, 963 F.3d 492, 497 (6th Cir. 2020); *Pugh*, 405 F.3d at 397. The meaning of Evidence Rule 702, and for that matter the *Daubert* considerations, amounts to a legal question. *See United States v. Jones*, 107 F.3d 1147, 1154 (6th Cir. 1997); *Bureau v. State Farm Fire & Cas. Co.*, 129 F. App'x 972, 975 (6th Cir. 2005).

The district court framed several *Daubert* factors incorrectly. Start with testability. The district court pitched the question as "whether the use of STRmix has been adequately tested and validated, independently of the testing by the developer." R.161 at 30. It then identified "shortcomings," *id.* at 31, in the way that the Michigan State Police laboratory had displayed its test results, leading the court to conclude that the factor weighed "strongly against" admitting STRmix, *id.* at 35. Even "serious deficiencies" in testing, however, do not render a method untestable. *Bonds*, 12 F.3d at 559. At stake is "scientific validity," not "scientific precision." *Id.* at 558. Gissantaner's, and the district court's, "attempt[s] to refute the [government's] theory and methods with evidence about deficiencies in both the results and the testing of the results," amounts to a "conce[ssion] that the theory and methods can be tested." *Id.* at 559. Although the independent experts in this case disagreed about the adequacy of the testing, that does not mean the theory is untestable or even that it has not been tested. *Id.*

Move to peer review. The district court's position—that the factor requires studies authored or conducted independently of the developers of STRmix—misapprehends the inquiry. Independent authorship may (or may not) represent the scientific ideal, but submission to peer review generally suffices under *Daubert*. The court also overstated the risks of allowing the developers of a new technology to be the ones who test it. The key developer of STRmix is a

civil servant who works for New Zealand. Any revenue from sales of the software goes to a government agency, which by all appearances seems as focused on sparing the innocent as on convicting the guilty. What inculpates one day may exonerate the next with DNA-sorting evidence.

But even if that were not the case, even if STRmix had been developed by a for-profit entity, that would not belittle its reliability. Think of all the medical and scientific breakthroughs innovated by private corporations. Once one starts compiling that list, it is hard to stop. Come to think of it, how many of the vaccines for COVID-19 grew out of not-for-profit work? Peer review, together with the other *Daubert* factors, works well in handling the self-interest, whether modest or extravagant, that comes with any invention.

Close with general acceptance. In concluding that this "factor does not add weight for a finding that the STRmix DNA analysis is reliable," R.161 at 43, the district court rooted its reasoning in the concern that STRmix "remains controversial" among a subset of the scientific community (computer scientists) and in cases involving small amounts of DNA. *Id.* But the existence of criticism, particularly as applied in specific cases, does not mean that STRmix has fallen short of "general" acceptance. The criticism at all events is overstated. Recall that the court appointed two experts under Evidence Rule 706. It then claimed that, because these two independent experts disagreed about using STRmix in this case, that meant it failed *Daubert*. But one of the experts, Dr. Krane, was not as independent as the court suggested. He was the president of the firm that employed Gissantaner's expert, and he had previously worked on the case for Gissantaner, all points explained to the court by the government. That does not prohibit Dr. Krane from offering expert testimony about STRmix on behalf of Gissantaner. It just means he should not have been treated as an independent Rule 706 expert in the case. *See* 29 Charles Alan Wright & Victor Gold, *Federal Practice and Procedure* § 6304 (2d ed. 2016); *cf. Gates v. United States*, 707 F.2d 1141, 1144 (10th Cir. 1983) (per curiam). All told, there was no conflict between independent experts about the generally reliability of STRmix at low percentages and low weights. In truth, the only independent expert in the case found it reliable.

The district court's misframing of these three factors provides one ground for our decision. Another is that the complete exclusion of such widely used scientific evidence, at least

on this record, would amount to an abuse of discretion anyway.  The district court mainly questioned the reliability of this evidence because the Michigan State Police laboratory did not internally validate STRmix at low contribution and weight levels.  As shown, however, the laboratory did validate STRmix at these levels, and so did the FBI.  The district court's concerns with the laboratory's internal validation stemmed largely from the way the data was presented: (1) The validation summary did not mention mixtures similar to the one here—in which the minor contributor donated a small absolute amount of DNA (49 picograms) and a small percentage of the DNA in the mixture (7%)—and (2) the supplemental data, which explained that the Michigan State Police laboratory ran tests on similar mixtures, did not include the likelihood ratios or the false-positive rates from those tests.

Rule 702 does not require unstinting perfection in presenting test results.  In light of the extensive evidence of STRmix reliability, including at low levels, these concerns were for the jury, not the court.  *See Kumho Tire*, 526 U.S. at 153 (explaining that if reasonable experts disagree, that is usually for the jury, not the court).  If the district court still wished to exclude the evidence based on a lack of data from the Michigan State Police laboratory's internal validation, it should have taken up the government's offer to present more evidence from the internal validation study.  That is especially so given that the government had so far made good in responding to shifting requests from Dr. Krane throughout the case.  Maybe the government has the precise false-positive rates from the laboratory's internal study; maybe it does not.  If it does, its failure to anticipate the independent expert's exact request does not justify excluding STRmix.  If it does not, any missing pieces can be used on cross-examination.

The court's reasoning in excluding the evidence gives pause in another respect.  The key concern expressed by the court was the low percentage and low quantity (just 8 or 9 cells) supplied by the minor contributor.  But it is the STRmix software, and nothing else, that supplied the factual premise for these points.  It is puzzling to think that STRmix would be sufficiently reliable to show that the minor contributor gave just 7% of the sample but then to cast doubt on 7% samples in general and to do so when combined with low weight samples (49 picograms) in particular.  Neither the district court nor Dr. Krane acknowledges, much less explains, the point.

As this last point suggests, the admissibility of this evidence is not the end of the road for Gissantaner.  It may help him in some ways.  Recall what the low 7% figure—created thanks to STRmix—means.  It suggests that Gissantaner contributed only 8 or 9 cells to the mixture of DNA found on the gun.  Holding a gun may not be the only way in which a small number of cells could land on a gun.  Gissantaner was the roommate of the gun's owner.  Perhaps their interaction, their shared use of objects in the kitchen, or their shared touching of objects in the house affected the sample.  That is what trials and juries are for.  Both sides also will have ample opportunities to show whether the Michigan State Police laboratory's testing of this sample was handled correctly and used correctly, and Gissantaner remains free to identify defects in the STRmix software.  We have not hesitated to correct civil or criminal verdicts in which the trial record showed that the science was misused.  *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010).  Evidence Rule 403 also remains relevant to the inquiry.  A district court concerned that the jury might misunderstand what the likelihood ratio means could require advocates to describe it in a way that will not generate "unfair prejudice" or "mislead[] the jury."  Fed. R. Evid. 403.  Even with the admission of STRmix, the government still must show "beyond a reasonable doubt" that Gissantaner possessed the gun.  *See Jackson v. Virginia*, 443 U.S. 307, 309 (1979).  That may become a critical question if no other credible evidence shows that Gissantaner handled this gun.

We reverse.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-2305

UNITED STATES OF AMERICA,

     Plaintiff - Appellant,

     v.

DANIEL GISSANTANER,

     Defendant - Appellee.

```
                                    ┌─────────────────────────┐
                                    │          FILED          │
                                    │      Mar 05, 2021       │
                                    │  DEBORAH S. HUNT, Clerk │
                                    └─────────────────────────┘
```

Before:  SUTTON, BUSH, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's grant of Daniel Gissantaner's motion to exclude DNA evidence is REVERSED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk